*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANTHONY LAMAR BONNER,

Defendant-Appellant.

UNPUBLISHED
June 24, 2025
9:28 AM

No. 359850
Ingham Circuit Court
LC No. 17-000577-FC

Before: YATES, P.J., and YOUNG and WALLACE, JJ.

PER CURIAM.

Defendant, Anthony Lamar Bonner, was tried and convicted by a jury in 2018 of criminal sexual conduct offenses committed against his 9-year-old great-niece, AL, but this Court reversed those convictions based on a violation of the right to a public trial. *People v Bonner*, unpublished per curiam opinion of the Court of Appeals, issued April 16, 2020 (Docket No. 346460). In 2021, defendant was retried and convicted again by a jury of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b); second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b), and assault with intent to commit criminal sexual penetration, MCL 750.520g(1). For his crimes, defendant was sentenced, as a fourth-offense habitual offender, to serve a minimum prison term of 25 years on each count of conviction. The trial court also ordered the prison term for CSC-I to run consecutive to the term of imprisonment for the assault offense. On appeal, defendant contests his convictions and his prison sentences on several grounds. We affirm.

## I. FACTUAL BACKGROUND

When the offenses of conviction occurred, AL and her mother, Ashley, were staying in a homeless shelter. Ashley said that they were both close to defendant, Ashley's uncle, who helped them with rides and occasionally took the children to school.[1]

---

[1] Ashley died before the second trial began. Ashley had testified at the first trial, so her testimony from that trial was read into the record at the second trial. Before the second trial, defense counsel

-1-

AL testified that, on the day of the assault, Ashley was in jail and AL was living at a shelter. Defendant picked up AL and her brother to drive both of them to school, dropped off AL's brother at his school, and then drove AL to his house. When they arrived at defendant's house, AL got on the couch. Defendant then grabbed AL, carried her to his bedroom, and tossed her onto his bed. Defendant was able to remove AL's pants and underwear despite her struggles. AL stated that she was screaming, kicking, and saying stop, but defendant grabbed her, told her that he was going to kill her, and slapped her in the face. Defendant performed cunnilingus on AL. He stopped when AL said she had to use the bathroom. After AL used the bathroom, defendant took AL back into the bedroom, removed his clothes, and tried to penetrate AL's anus with his penis.

AL promptly told Ashley about the assault during a telephone call while Ashley was in jail. AL said that defendant had touched her "middle," which Ashley knew meant AL's "private." But on cross-examination at trial, Ashley admitted that she was not sure that that is what AL had said on the call. During that conversation, AL did not tell Ashley that defendant had penetrated her or that her clothes were removed. In response, Ashley told another person to notify the police.

The next day, May 23, 2017, AL went to see a sexual assault nurse examiner. During that examination, AL disclosed that defendant had rubbed her private parts while her clothes were still on. She also told the nurse examiner that defendant had hit her and had threatened to kill her. The nurse examiner noticed a linear mark on AL's face that was consistent with being hit by a hand, so the nurse examiner took photographs of bruising on AL's face.

Thomas Cottrell testified for the prosecution as an expert in "child sexual abuse and child sexual abuse episodes." Cottrell's testimony was the subject of a pretrial motion from defendant, and the trial court entered an order restricting Cottrell's testimony. Under that order, Cottrell was barred from testifying: (1) that sexual abuse occurred; (2) that AL was credible; (3) that defendant was guilty; (4) about "any numerical or quantitative measurement of the frequency with which children fabricate allegations of sexual assault"; and (5) about "any description of specific factual scenarios in which children are more likely to fabricate allegations of sexual assault, especially if those specific factual scenarios are not present in this case."

Cottrell testified that he had not met AL or defendant. He discussed factors that may affect a child's disclosure of sexual assault. Cottrell distinguished between a child lying about a sexual assault and a child who had his or her memory changed via coaching. Regarding coaching a child, he testified that it was "very, very, very difficult to have [a child] be coached and believe something that is painful that they would not want to have happen."

AL testified about a second incident that occurred at an unspecified time different from the reported sexual assault. In that incident, AL was on the floor in defendant's house watching videos on her phone when defendant came in, put his hands in AL's shirt, and touched her breasts. In his own defense, defendant testified at trial and denied that he ever sexually assaulted AL. The jury convicted defendant of CSC-I, CSC-II, and assault with intent to commit sexual penetration. The

---

argued that the jury should not be told that Ashley was deceased because that could elicit sympathy for AL. The trial court ruled that the jury would be told that Ashley was "unavailable," but would not be told that she was deceased.

trial court thereafter sentenced defendant to serve 25 to 50 years in prison for CSC-I, a consecutive prison term of 25 to 50 years for assault with intent to commit sexual penetration, and a concurrent prison term of 25 to 50 years for CSC-II.

Years later, the trial court held an evidentiary hearing on February 27, 2025, to consider issues concerning the jury selection that took place at defendant's trial. After hearing the evidence, the trial court denied defendant a new trial despite his claim that "there wasn't a fair representation of the venire in this case, and then that would entitle [defendant] to a new trial." With that issue resolved, we can now address defendant's appeal of right from his convictions and sentences.

## II. LEGAL ANALYSIS

Defendant contests his convictions on four grounds. First, he contends Cottrell's testimony was improper, and the admission of that testimony was error requiring reversal. Second, he asserts the jury pool for his trial—which he insists contained only six "people of color"—did not represent a fair cross section of the community. Third, he claims the trial court erred by denying his motion to disqualify the trial judge. Fourth, he criticizes the trial court for denying his motions for mistrial. Next, defendant challenges his sentences on two bases. First, he contends his sentences resulting from statutory mandatory minimum prison terms were disproportionate. Second, he faults the trial court for abusing its discretion by imposing consecutive sentences. We will address his challenges to his convictions first, and then we will turn to his arguments about his sentences.

## A. EXPERT TESTIMONY

Defendant claims the trial court abused its discretion when it admitted the expert testimony of Thomas Cottrell. Specifically, defendant insists as a threshold matter that the trial court should not have permitted Cottrell to provide any expert testimony. Beyond that, defendant contests the admission of Cottrell's expert testimony that it is difficult to coach children to believe that a painful event occurred. Further, defendant contends that Cottrell improperly testified about the signs that such an allegation is truthful, because Cottrell's expert testimony did not satisfy the requirements of MRE 702, nor did it respect the trial court's pretrial order limiting Cottrell's testimony.

Admission of expert testimony is governed by MRE 702. Under that rule of evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion" if the proponent of the expert testimony demonstrates "that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." MRE 702(a)-(d). Here, defendant asserts that Cottrell was not qualified to furnish expert testimony, and that the expert testimony from Cottrell crossed several lines established by MRE 702 and a pretrial order. We shall address these claims in turn.

### 1. QUALIFICATION TO PROVIDE EXPERT TESTIMONY

Prior to trial, and again during trial, defendant challenged Cottrell's qualifications to offer expert testimony on "child sexual abuse dynamics," arguing that Cottrell was no expert and noting that Cottrell's expert testimony in other proceedings had "result[ed] in overturned cases and new

trials[,]" so he "shouldn't be trusted by [the trial court] to obey its orders and the Michigan Rules of Evidence." This Court reviews "a trial court's decision finding an expert qualified for an abuse of discretion." *People v Christel*, 449 Mich 578, 592 n 25; 537 NW2d 194 (1995). A decision of the trial court regarding an expert witness "will not be disturbed unless the decision falls 'outside the range of principled outcomes.' " *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*.

At a pretrial hearing on August 26, 2021, the trial court ruled that Cottrell could testify as an expert witness at trial. And when Cottrell testified at trial, the prosecution questioned him on his credentials, defense counsel conducted a voir dire examination of him, and the trial court ruled that he was qualified to testify as an expert witness. Specifically, the trial court adduced testimony that Cottrell had previously been "qualified as an expert in over 300 cases" in "child sexual abuse and child sexual abuse episodes[.]" The trial court made all of the findings required under MRE 702 to qualify an expert witness, and then stated that "[t]he credibility of every witness, including an expert, is in the hands of the capable jury." The trial court did not abuse its discretion when it qualified Cottrell as an expert witness.

Although defendant persuasively argues that Cottrell's expert testimony in numerous other cases has been declared improper, no prior case in this Court or our Supreme Court has resulted in a ruling that Cottrell is not qualified to provide expert testimony.[2] Indeed, in *Thorpe*, 504 Mich at 259-260, our Supreme Court found fault with Cottrell's expert testimony, but did not even suggest that he was not qualified to testify as an expert witness. Similarly, on the first appeal in this case, defendant claimed "the trial court abused its discretion by admitting Thomas Cottrell's testimony regarding child sexual abuse and the dynamics of child sexually abusive episodes because it did not meet the relevancy and reliability requirements of MRE 702," *Bonner*, unpub op at 2, but this Court did not accept that argument, ruling more narrowly that Cottrell's testimony crossed the line at one specific point. *Id*. at 4-5. In light of these two rulings dealing specifically with Cottrell, we conclude that the trial court did not commit an abuse of discretion by allowing him to testify as an expert witness. To be sure, Cottrell's expert testimony has caused serious problems in numerous prior cases,[3] but the trial court acted within its discretion when it permitted him to testify, just as more than 300 other trial courts have chosen to do.

---

[2] This Court once devoted a lengthy paragraph to explaining why "the record is clear that a *Daubert* hearing was not necessary" to consider whether Cottrell was qualified to provide expert testimony, and stated any such challenge would be "meritless." *People v Gonzalez-Barcena*, unpublished per curiam opinion of the Court of Appeals, issued December 17, 2020 (Docket No. 348429), p 6.

[3] In addition to the rulings in *Thorpe*, 504 Mich at 259-260, and the first appeal in this case finding Cottrell's expert testimony improper, his expert testimony has resulted in appellate condemnations in several other cases in recent years, including *People v Parks*, unpublished per curiam opinion of the Court of Appeals, issued August 19, 2021(Docket Nos. 349362 and 350305), p 7; *People v Yensen*, unpublished per curiam opinion of the Court of Appeals, issued March 25, 2021 (Docket No. 350176), p 6; *People v Brooks*, unpublished per curiam opinion of the Court of Appeals, issued January 28, 2021 (Docket No. 349955), p 5; and *People v DeLeon*, unpublished per curiam opinion of the Court of Appeals, issued April 30, 2020 (Docket No. 346952), pp 4-5.

## 2. CHALLENGES TO THE EXPERT TESTIMONY PROVIDED AT TRIAL

To explain defendant's challenge to Cottrell's expert testimony in this case, we must first provide some background to put his testimony in context. Our Supreme Court has stated that it is improper for an expert to testify that children lie about sexual abuse 2% to 4% of the time because that amounts to the expert vouching for the veracity of the child. *Thorpe*, 504 Mich at 259. The expert witness in *Thorpe*—who was Cottrell—identified only two specific circumstances in which he had experienced children lie about sexual abuse, neither of which existed in that case. *Id*. "As a result, although he did not actually say it, one might reasonably conclude on the basis of Cottrell's testimony that there was a 0% chance that [the victim] had lied about sexual abuse." *Id*.

At defendant's trial, Cottrell testified as follows:

What the research points to is what—particularly with regard to suggestibility in children and even coaching, is children can be coached relatively eas[il]y to offer renditions of things that are pleasant and are things they would enjoy or things that they would aspire to. It is very, very, very difficult to have them be coached and believe something that is painful that they would not want to have happen.

The logical inference to be drawn from that testimony is that children cannot be coached to make false allegations of something "painful," like child sexual abuse. But defendant did not object to that testimony, so that argument was not preserved. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004). We review unpreserved claims for plain error that affected substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. To establish "plain error affecting his substantial rights," defendant must show "that he was actually innocent or that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of his innocence." *Knox*, 469 Mich at 508.

Here, the challenged testimony strikes us not just as error, but as error that was plain. The expert witness effectively told the jury that it is nearly impossible to coach a child to make a false allegation about anything "painful," which certainly encompasses sexual abuse. Cottrell's expert testimony that "[i]t is very, very, very difficult to have [children] be coached" to believe a painful experience occurred runs headlong into our Supreme Court's proscription of vouching for a child witness's credibility. *Thorpe*, 504 Mich at 259. Indeed, to describe anything as "very, very, very difficult" leads ineluctably to the conclusion that it would almost never happen. Although Cottrell did not quantify the likelihood that a coached child would make a false allegation of sexual abuse, his testimony openly invited the inference that it would almost never occur.

But defendant's showing of a plain error does not necessarily require reversal. Rather, this Court "should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. at 253. In defendant's first appeal, this Court found that Cottrell's expert testimony constituted error, but it was harmless because "corroborating evidence was presented in this case—a visible facial bruise corresponded to the victim's testimony that defendant had struck her." *Bonner*, unpub op at 5. At defendant's second trial, that same evidence of a bruise was presented, thereby corroborating AL's description

of the events that led to defendant's convictions. But unlike defendant's first appeal, in which the error in Cottrell's expert testimony was preserved, defendant now comes before this Court with an unpreserved error, so he must overcome a higher burden to obtain relief for the error. Defendant has not met that burden by establishing that the plain error affected his substantial rights, so he has not shown that reversal is warranted.

Defendant also challenges Cottrell's expert testimony that if an impetus for false disclosure dissipates, a child will distance himself or herself from the subject. On cross-examination, defense counsel listed scenarios and asked Cottrell if those situations would cause a child to make a false claim of sexual abuse. The scenarios were to garner sympathy from a parent, to get attention from a "wayward parent," to act out of anger or revenge, or to act in response to being coached. Cottrell acknowledged those could be reasons why a child would make a false allegation of sexual assault. On redirect examination, the prosecutor followed up on those questions from defense counsel, and elicited Cottrell's opinion that if an impetus for lying dissipates, a child would distance himself or herself from the subject. Defendant views that opinion as improper. To the extent that that portion of Cottrell's expert testimony was improper because it did not meet the requirements of MRE 702 or it violated the pretrial order's prohibition on describing "factual scenarios in which children are more likely to fabricate allegations of sexual assault," it was defense counsel who raised the factual scenarios. Thus, defendant has not established that plain error occurred in that regard.

## B. THE FAIR-CROSS-SECTION CLAIM

Defendant asserts that the jury pool for his case did not represent a fair cross section of the community. Defendant, who is Black, contends that only 6 of the 85 individuals in the venire were "people of color." After the jury was sworn, but before evidence was presented, defense counsel objected to the racial composition of the venire, which he complained included only 6 "persons of color" out of 85 people, as well as the seated jury, which he asserted was "100 percent Caucasian." As defendant explains in his appellate brief, "[p]rior to the start of testimony, the defense made a *Batson*[4] challenge and objected to the jury pool due to the fact that out of 85 potential jurors, only 6 were minorities."[5]

In 2023, this Court issued an order that provided defendant access to information about the jury pool. *People v Bonner*, unpublished order of the Court of Appeals, entered February 23, 2023 (Docket No. 359850). In 2024, this Court granted defendant's request to remand this matter "to

---

[4] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). To be clear, the decision of the United States Supreme Court in *Batson* has no bearing on this case because it deals with the use of peremptory challenges. *Id*. at 82. Thus, the invocation of *Batson* by defendant and the trial court can best be described as incorrect.

[5] Defendant consistently refers to the "jury pool" instead of the venire. According to our Supreme Court, the "venire" means "the group of potential jurors in the courtroom from which a defendant's petit jury [is] selected[,]" whereas the "jury pool" is "the group of people summoned to appear for jury duty on the particular day." *People v Bryant*, 491 Mich 575, 583 n 4; 822 NW2d 124 (2012). Accordingly, we shall refer to the group of 85 potential jurors from which defendant's jurors were selected in the courtroom as the venire, rather than the jury pool.

the trial court for an evidentiary hearing to develop the record regarding the under-representation of African-Americans in the jury pools over a period of time prior to defendant's August[] 2021[] trial, and the method of selecting the jury pools for Ingham Circuit during that time—and the trial court's decision whether the second and third prongs of the test [enumerated in *People v Bryant*, 491 Mich 575, 597; 822 NW2d 124 (2012)] have been established." *People v Bonner*, unpublished order of the Court of Appeals, entered July 29, 2024 (Docket No. 359850). After that evidentiary hearing, which included testimony from Jeffrey Martin, an expert in jury procedures and statistics, the trial court denied defendant's motion for a new trial. We conclude that defendant has failed to establish that he was denied his right to be tried by an impartial jury drawn from a fair cross section of the community.

The Sixth Amendment of the United States Constitution afforded defendant "the right to be tried by an impartial jury drawn from a fair cross section of the community." *Bryant*, 491 Mich at 595. Whether a defendant was denied the Sixth Amendment right "to an impartial jury drawn from a fair cross section of the community is a constitutional question that we review de novo." *Id*. We review "the factual findings of a trial court for clear error, which exists when the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id*. (quotation marks omitted).

To make a prima facie case of a violation of the fair-cross-section requirement, a defendant is obligated to demonstrate: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Bryant*, 491 Mich at 597, quoting *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979). Defendants may offer statistical evidence to meet the burden, but "when applying the relevant statistical tests, a court must examine the composition of jury pools and venires *over time* using the most reliable data available to determine whether representation is fair and reasonable." *Id*. at 599-600. Our Supreme Court has made clear that it is important to review the representation over "a significant time period" because "underrepresentation in a single venire could result from chance[.]" *Id*. at 600, 602.

The process for creating jury pools in Michigan is prescribed by statute. Pursuant to MCL 600.1304, "The jury board shall select from a list that combines the driver's license list and the personal identification cardholder list the names of persons as provided in this chapter to serve as jurors." At the evidentiary hearing, the base number that defendant's expert used was the number of people who lived in Ingham County, were at least 18 years old, and were citizens of the United States. But under Michigan law, there are additional requirements to be eligible to serve on a jury. Specifically, in addition to being at least 18 years old and a citizen of the United States, a potential juror must be able to communicate in the English language, must be physically and mentally able to carry out the functions of a juror, must not have served as a petit or grand juror in the preceding 12 months, and must not have been convicted of a felony. MCL 600.1307a(1)(a)-(e). Therefore, the expert's analysis proceeded on dubious grounds because it did not compare the actual juror list against the total population of people who were eligible for jury service in Ingham County.

According to the expert's report, in Ingham County, 11.39% of the jury-eligible individuals were "Black or African-American," 6.99% were "Hispanic or Latino," and 74.90% were "White

persons."[6]  Using geocoding,[7] the expert estimated that 85.85% of the people on Ingham County's jury list were "White," 5.15% were "Black or African-American," and 4.04% were "Hispanic or Latino."  The expert applied several statistical analyses to that data that had been used in previous cases: the absolute-disparity test; the comparative-disparity test; and standard-deviation analysis.

Under the absolute-disparity test—the difference between the percentage representation of a group in the population and the percentage representation of the same group in the jury list—the expert determined that the underrepresentation of Black or African-American persons was 6.24% (11.39% minus 5.15%), and the underrepresentation of Hispanic or Latino individuals was 2.96% (6.99% minus 4.04% "with rounding").  In addition, applying the comparative-disparity test—the absolute disparity of a group divided by the population percentage of the group—the expert found that Black or African-American individuals were underrepresented by 54.78% (6.24% divided by 11.39%) and Hispanic or Latino individuals were underrepresented by 42.30% (2.96% divided by 6.99%).

Finally, the expert calculated the standard deviation for this data, which he described as an analysis that identifies whether underrepresentation is "statistically significant," i.e., "whether the demographics of the jury list diverge substantially enough from the population demographics that the difference is not the product of chance but is systematic."  According to the expert, anything greater than 2 or 3 standard deviations is considered statistically significant.  The expert found that the percentage of Black or African-American persons on the jury list differed from the population by 63 standard deviations, and the percentage of Hispanic or Latino persons on the jury list differed from the population by 37 standard deviations.  With that analysis in mind, we must consider the three elements of the *Duren* test, which our Supreme Court embraced in *Bryant*, 491 Mich at 597.

## 1.  A "DISTINCTIVE GROUP"

Under the first prong, defendant must establish that "the group alleged to be excluded is a 'distinctive' group in the community[.]"  *Id*.  Neither the prosecution nor the defense disputes that African-Americans constitute a distinctive group in the community.  See *id*. at 598.  Consequently, the first element has been satisfied.

---

[6] We note that this is not a complete breakdown of the jury-eligible pool because those figures add up to only 93.28%, rather than 100%.

[7] The expert used "geocoding" to estimate the racial makeup of the jury list because actual data regarding the racial makeup of the juror list was not available.  In a similar situation in which that data was unavailable, our Supreme Court approved of the use of this exact type of geocoding to estimate the racial makeup of the juror lists.  *Bryant*, 491 Mich at 602-603 (noting that a statistical expert "was able to estimate, using the racial makeup of each zip code from the census data, the number of African-Americans who had been summoned for jury service[,]" and holding that it was appropriate to use that statistical estimate to evaluate venire composition "[g]iven the available zip-code data and the limitations regarding the other potential data sources").

## 2. "FAIR AND REASONABLE" REPRESENTATION

Under the second prong, defendant must establish "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Id*. at 597. The fact that a group is underrepresented is not dispositive; defendant must establish that the underrepresentation is not "fair and reasonable in relation to the number of such persons in the community[.]" *Id*. at 598 (quotation marks and citation omitted). The numbers that the expert provided, by themselves, do not establish that the underrepresentation was not fair and reasonable.

The expert found that the "absolute disparity" calculation reflected that Black people were underrepresented by 6.24% and that Hispanic or Latino people were underrepresented by 2.96%. "Courts have generally required an absolute disparity of more than 10 percent to indicate that the representation of the distinct group was not fair and reasonable." *Id*. at 604. Our Supreme Court commented that this approach is problematic when analyzing a group that does not make up a large percentage of the population. *Id*. (The absolute-disparity test "is often criticized because it makes it difficult, if not impossible, for a defendant to make this showing if the distinct group has a small population in the community."). Despite the deficiencies our Supreme Court noted, this analysis by the expert does not support defendant's argument that the underrepresentation of those groups was not fair and reasonable.

For "comparative disparity," the expert observed that Black people were underrepresented by 54.78% and Hispanic or Latino people were underrepresented by 42.30%. Our Supreme Court has concluded that a comparative disparity of 49.45% did not establish that the identified group's underrepresentation was not fair and reasonable. *Id*. at 607-609. Specifically, our Supreme Court noted that several federal appellate courts have "found permissible comparative disparities above 50 percent." *Id*. at 607-608. Additionally, our Supreme Court has observed that the "comparative disparity" test "is particularly defective when the claim involves a small population of a distinct group because it distorts the extent of any underrepresentation." *Id*. at 607. Indeed, our Supreme Court criticized this Court for "effectively establishing a bright-line rule favoring the comparative-disparity test when the population of the distinct group is small." *Id*. Therefore, the comparative-disparity test does not establish that the underrepresentation here was not fair and reasonable.

Finally, turning to the "standard-deviation test," the expert calculated that the percentage of Black or African-American persons on the jury list differed from the population by 63 standard deviations, and the percentage of Hispanic or Latino individuals on the jury list differed from the population by 37 standard deviations. But our Supreme Court has decreed that standard deviation "has nothing to do with the evaluation of the second prong" of the *Duren* test. *Id*. at 610. It has acknowledged that that analysis may be relevant to the third prong, *id*., but "whether the degree of underrepresentation is statistically significant and not the result of chance does not inform whether the level of underrepresentation is fair and reasonable." *Id*. Instead, the standard-deviation "test actually measures . . . the randomness of a given disparity, not the extent of the disparity." *Id*.

In sum, establishing mere underrepresentation is insufficient to establish this second prong. See *id*. at 603 ("[I]t is clear that African-Americans were underrepresented. The pertinent question then is whether this underrepresentation in the composition of jury pools and venires during this time was nonetheless fair and reasonable."). Our Supreme Court has cited numerous examples of

venires in which a distinct group was underrepresented, but the underrepresentation was not shown to be anything less than fair and reasonable. *Id*. at 604, 607-608. Consequently, under the second prong, defendant failed to establish—or even present an argument—that the underrepresentation of certain groups on the jury list was not "fair and reasonable."

### 3. SYSTEMATIC EXCLUSION

To satisfy the third prong, defendant has to show that the underrepresentation of members of a distinctive group was "due to systematic exclusion of the group in the jury-selection process." *Id*. at 597. In other words, defendant must establish "that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." *Id*. at 598. For that reason, "it is well settled that systematic exclusion cannot be shown by one or two incidents of a particular venire being disproportionate." *People v Flowers*, 222 Mich App 732, 737; 565 NW2d 12 (1997). Here, defendant has shown nothing more than a single incident, i.e., his own case, of a venire being disproportionate.

At the evidentiary hearing conducted by the trial court, the jury administration coordinator for Ingham County with 30 years of experience explained in detail the process that the county used to assemble jury lists and venires. Her testimony made clear that Ingham County follows the state-law requirements prescribed by our Legislature, and she stated emphatically that "[t]here's nothing in the system that excludes any minorities." In response, defense counsel simply suggested that a flaw may be present "because people without a driver's license—with a suspended license are not allowed on the juries, . . . that's a systemic problem and . . . it denied [defendant] a jury pool of his representative . . . community." In other words, defendant provided nothing to demonstrate a flaw in the system that resulted in a violation of the fair-cross-section requirement for anyone other than him, and the only flaw defendant even suggested was unsupported by any evidence that it produced racial disparity in the composition of venires in Ingham County. Indeed, defendant's statement of the question presented in his supplemental brief reveals the shortcomings regarding the third prong of the analysis: "The juror pool here, which contained 6 people of color out of 85, did not represent a fair cross-section of [his] community, in violation of his Sixth Amendment rights."

### C. MOTION FOR JUDICIAL DISQUALIFICATION

When this Court reversed defendant's convictions in 2020 based on denial of the right to a public trial, this Court stated that "we take no position regarding defendant's judicial bias claim[,]" but, "[o]n remand, defendant may pursue a motion for disqualification of the trial judge." *Bonner*, unpub op at 13. When the case returned to the trial court, defendant moved to disqualify the trial judge, alleging bias based on statements the judge made at the sentencing hearing after defendant's first trial. See MCR 2.003(C)(1)(a). When the trial judge declined to step aside, defendant sought relief from the chief judge, see MCR 2.003(D)(3)(a)(1), who issued an opinion on November 25, 2020, upholding the trial judge's decision to remain on the case despite defendant's claim of bias.

"When this Court reviews a motion to disqualify a judge, the trial court's findings of fact are reviewed for an abuse of discretion; however, the applicability of the facts to relevant law is reviewed de novo." *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 596; 640 NW2d 321 (2001). A "party who challenges a judge on the basis of bias or prejudice must overcome a heavy

presumption of judicial impartiality." *Cain v Mich Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996).

MCR 2.003(C)(1) provides a non-exhaustive list of grounds for disqualification of a judge, and states in part:

> Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:
>
> (a) The judge is biased or prejudiced for or against a party or attorney.
>
> (b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

Canon 2(B) of the Code of Judicial Conduct states that a judge "should respect and observe the law." Also, "the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary." Finally, "a judge should treat every person fairly, with courtesy and respect."

This Court identified the bounds of acceptable language for the trial court at a sentencing hearing in *People v Antoine*, 194 Mich App 189, 191; 486 NW2d 92 (1992), where, in response to the defendant's claim that the trial court's comments made at sentencing showed bias and hostility, this Court stated that a sentencing hearing "is the time for comments against felonious, antisocial behavior recounted and unraveled before the eyes of the sentencer." This Court observed that "the language of punishment need not be tepid." *Id*.

Here, defendant's motion to disqualify the trial judge before the second trial was predicated on statements made by the trial judge and others at the first sentencing hearing. Specifically, the trial judge advised defendant that he would get weaker in prison while AL would get stronger, and that he would not have the control that he wanted. The trial judge also stated that in a letter to the court submitted before sentencing, defendant blamed the victim. Additionally, defendant noted that the trial judge allowed the victim impact statement to contain statements that defendant was going to rot in Hell. Further, the trial judge permitted the victim's great aunt to accuse defendant of assaulting other people. Also, defendant accused the trial judge of "act[ing] like a cheerleader for" the victim by talking about how brave AL had been to come into court and testify, and asking AL's aunt to give AL a hug.

In response, the trial judge found neither a basis for disqualification nor a showing of bias, prejudice, or unfairness. The trial judge promised that she could be fair and impartial and follow the law. Subsequently, on review, the chief judge wrote that sentencing is an appropriate time for a judge to express support for a victim and to admonish a defendant. Accordingly, the chief judge found no basis for disqualification. On appeal, defendant contends that the identified portions of the first sentencing hearing establish that the trial judge showed bias or prejudice, as contemplated by MCR 2.003(C)(1)(a), or the appearance of impropriety, as contemplated by Canon 2(B) of the Code of Judicial Conduct.

The trial judge did not behave improperly at the sentencing after defendant's first trial, as judges are permitted to make "comments against felonious, antisocial behavior" and their language "need not be tepid." *Antoine*, 194 Mich App at 191. Given that the trial judge acted appropriately at the first sentencing hearing, defendant's claim that that sentencing hearing revealed bias, or the appearance of bias, by the trial judge is unpersuasive. As the chief judge aptly noted, defendant's claim suggests that the judge could not unsee what was seen at the first trial, which would require the trial court to reassign every case on remand after a conviction was vacated. We are aware of no such rule, nor would such an approach be defensible. Accordingly, defendant has not met his burden of overcoming the heavy presumption of impartiality. See *Cain*, 451 Mich at 497.

## D. MOTIONS FOR MISTRIAL

Next, defendant asserts that the trial court abused its discretion when it denied defendant's various motions for a mistrial. Defendant moved for a mistrial after the prosecutor asked AL what her deceased mother's name "was," despite the fact that the trial court had ruled that the jury would not be told of her death. Defendant again moved for a mistrial after the prosecutor, in her closing argument, referred to "previous trial testimony," which defendant contends was an impermissible reference to defendant's first trial. "The denial of a motion for a mistrial is reviewed for an abuse of discretion." *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003). "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant . . . and impairs his ability to get a fair trial." *Id*. (quotation marks and citation omitted). "[T]he extent of the prejudice is a critical factor: The moving party must establish that the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Beesley*, 337 Mich App 50, 54; 972 NW2d 294 (2021) (quotation marks and alteration marks omitted).

Before trial, defense counsel stated that he did not want the jurors to hear that Ashley had died, because it could elicit sympathy towards AL. The trial court ruled that the jury would not be told that Ashley had died, but would be told that she was "unavailable," and her prior testimony would be read into the record. Based on that decision, the trial court informed the jury that Ashley was unavailable before her prior testimony was read to the jury.

At the beginning of AL's testimony, the prosecutor asked: "what was your mom's name?" AL replied, "Ashley." At the next break, defense counsel asked for a mistrial because the question about Ashley's name, phrased in the past tense, suggested that she was deceased. Defense counsel argued that this violated the trial court's pretrial ruling that the jury would not be told that Ashley was deceased. The prosecutor responded that it was unintentional. She explained that she thought about correcting the question, but she thought that would draw more attention to it. The trial court observed that it was common for "was" to be interchanged with "is," and ruled that that slip of the tongue was not enough to warrant a mistrial.

We conclude that the trial court did not abuse its discretion by denying defendant's request for a mistrial on that basis. The court correctly noted that people sometimes use "was" colloquially to mean "is." In fact, soon after the question at issue was posed, the prosecutor asked AL whether her stepfather "did" have a nickname, even though he was alive and testified at trial. To the extent that the prosecutor's use of "was" instead of "is" in the question violated the court's pretrial order, such a violation is not an automatic basis for a mistrial. In both his argument before the trial court and his argument on appeal, defendant failed to establish that the purported error was so egregious

that the prejudicial effect, to the extent there was any at all, could be removed in no way other than by declaring a mistrial. See *Beesley*, 337 Mich App at 54. In addition, defendant failed to establish that the wording of the question deprived him of a fair trial. See *Alter*, 255 Mich App at 205.

Defendant contends that the prosecutor improperly referred to defendant's first trial during her closing argument when the prosecutor asserted that "[m]ultiple people in this trial were Cross-Examined about their previous trial testimony."[8] After closing arguments, defendant moved for a mistrial, but the trial court denied that relief, noting that both sides had "crossed a few lines" and that any error was harmless. Defendant faults the trial court for summarily dispensing with a claim of prosecutorial misconduct that warranted scrutiny.

The trial court's decision that, to the extent error occurred, it was harmless, was not outside the range of reasonable and principled outcomes. Throughout the trial, both parties referred to the prior proceedings, including references from defense counsel to "previous[]" testimony and a prior "hearing." Thus, the jury was clearly made aware that earlier proceedings of some sort had taken place. In addition, because the jury was not informed of the outcome of the prior trial, it is hard to imagine any prejudice defendant suffered. Defendant does not explain how the jurors' knowledge of prior proceedings caused him prejudice, aside from the conclusory statement that it denied him a fair trial. Because defendant failed to establish that any error was so egregious that the prejudicial impact could not be removed by any remedy short of a mistrial, *Beesley*, 337 Mich App at 54, and that it impaired his ability to receive a fair trial, *Alter*, 255 Mich App at 205, the trial court did not abuse its discretion when it denied defendant's request for a mistrial.

## E. SENTENCE PROPORTIONALITY

Defendant contends that his sentences are disproportionate to the offense and the offender. Defendant claims that his sentences are not proportionate to the offender because he had no felony conviction since 2011 and none of his prior convictions involved sexual offenses. He also insists that the sentences are not proportionate to the offense because his crimes in this case were isolated incidents, rather than something that occurred continuously over a long period of time. Therefore, defendant concludes that the trial court erred by characterizing him as a danger to the community who would commit another sexual offense upon release. We disagree that defendant's sentences, which were statutorily prescribed mandatory minimum prison terms, were disproportionate.

According to MCL 769.12(1), a trial court "shall sentence the person to imprisonment for not less than 25 years" if that person "has been convicted of any combination of 3 or more felonies or attempts to commit felonies" with at least 1 prior felony conviction being a "listed prior felony," and that person commits a subsequent felony that is considered a "serious crime." Defendant does not contend that the trial court erred when it determined that he was subject to mandatory minimum prison terms of 25 years under MCL 769.12(1) because he had been convicted of three or more felonies, that at least one of the prior felony convictions was a "listed prior felon[y]," and that his convictions in the instant case each constituted a "serious crime." Indeed, at sentencing, defense

---

[8] On appeal, defendant does not quote the language he contests. We presume that the language we have quoted forms the basis of defendant's appeal.

counsel acknowledged that there was a 25-year mandatory minimum imposed by statute and told the trial court that "25 years for the conviction here is appropriate based on the law."

The record establishes that defendant was subject to a 25-year mandatory minimum prison term under MCL 769.12(1).[9]  Defendant had an extensive criminal record, including assault with a dangerous weapon, which is a "listed prior" felony.  See MCL 769.12(6)(a)(*iii*).  Additionally, each count of conviction is considered a "serious crime."  See MCL 769.12(6)(c).  By stating that "the court shall sentence the person to imprisonment for not less than 25 years," our Legislature mandated that the trial court impose a sentence of at least 25 years.  MCL 769.34(2)(a) ("If a statute mandates a minimum sentence for an individual sentenced to the jurisdiction of the department of corrections, the court shall impose a sentence in accordance with that statute.").  Because the trial court was required to sentence defendant to at least a 25-year minimum prison term, the 25-year minimum sentence the trial court imposed was not disproportionately high.[10]

Defendant suggests the cumulative prison term resulting from his consecutive sentences is disproportionate.  But this Court must analyze a proportionality challenge by focusing only on "the individual [prison] term imposed and not on the cumulative effect of multiple sentences." *People v Norfleet*, 317 Mich App 649, 663; 897 NW2d 195 (2016).  Therefore, the cumulative effect of the consecutive sentences is not relevant to a proportionality review.  Defendant's challenge to the proportionality of his sentences, which were the statutory minimum prison terms that the trial court could impose, is meritless.

## F.  CONSECUTIVE SENTENCES

Finally, defendant asserts that the trial court abused its discretion by imposing the prison term for the CSC-I conviction to be served consecutively to the prison term for the assault offense.  Defendant argues that consecutive sentences were inappropriate because he merely had a few prior felony convictions that did not involve sexual assault, and the offenses of conviction in the instant case were isolated incidents.  He further claims that consecutive sentences were "overkill" because at his advanced age of 51, even one 25-year prison term was "already a life sentence."  We disagree that the trial court abused its discretion when it imposed consecutive sentences.

---

[9] In this appeal, defendant does not argue that the statute mandating a 25-year minimum sentence is unconstitutional.  We note that this Court has previously rejected that constitutional argument. *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021) (discussing MCL 769.12(1)(a) in the context of an argument about cruel or unusual punishment).

[10] Even if we could conduct a proportionality review of defendant's sentences, we do not believe his criminal history would be a factor that would weigh in his favor.  Defendant cites his criminal history as a reason that his sentence was disproportionately high.  But this argument is peculiar, given defendant's history of felony convictions.  In 1990, defendant was convicted of delivering or manufacturing a controlled substance.  In 1992, defendant was convicted of aggravated assault and arson.  Defendant was incarcerated for those crimes until 2006.  In 2011, he was convicted of three counts of assault with a dangerous weapon.

-14-

For a conviction of CSC-I, a trial court "may order a term of imprisonment . . . to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." MCL 750.520b(3). If "a statute grants a trial court discretion to impose a consecutive sentence, the trial court's decision to do so is reviewed for an abuse of discretion, i.e., whether the trial court's decision was outside the range of reasonable and principled outcomes." *Norfleet*, 317 Mich App at 654. For any discretionary consecutive sentence, "the combined term is not itself subject to a proportionality review[.]" *Id*. at 664. The trial court is required "to justify each consecutive sentence imposed" in order to ensure that "the 'strong medicine' of consecutive sentences is reserved for those situations in which so drastic a deviation from the norm is justified." *Id*. at 665.

Here, the trial court directed that defendant's prison term for the CSC-I conviction must be served consecutive to the prison term imposed for assault with intent to commit sexual penetration. The trial court observed that defendant had an extensive criminal history that included aggravated assault, arson, and multiple convictions of assault with a dangerous weapon. Also, defendant's assaultive behavior had escalated to the point of sexual assault against AL. The trial court further emphasized that defendant had threatened to kill AL. The trial court implied that defendant had a low chance of being reformed, given his violent history and the escalation of his behavior. On that basis, the trial court concluded that defendant needed to be incarcerated for the rest of his life.

The trial court did not abuse its discretion by ordering consecutive sentences, especially in light of the escalation of defendant's criminal acts. Defendant progressed from a drug offense to aggravated assault to arson to assault with a dangerous weapon, and then he committed CSC-I and other sexual crimes against a young girl. Defendant emphasizes the periods of time during which he was not convicted of any crimes, but those conviction-free periods can be attributed, at least in part, to the fact that defendant was incarcerated for much of that time. Defendant is in his 50s, and he still has not reformed his criminal behavior. Thus, the trial court did not abuse its discretion when it exercised the discretion afforded by our Legislature to impose consecutive sentences.

Affirmed.

/s/ Christopher P. Yates
/s/ Randy J. Wallace

-15-