*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 05, 2025
1:47 PM

Plaintiff-Appellee,

v

Nos. 361717; 361718
Genesee Circuit Court
LC Nos. 19-045755-FC;
19-045556-FH

TROY D-DUANE WILLIAMS,

Defendant-Appellant.

Before: ACKERMAN, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals as of right from his March 29, 2022 jury convictions in two consolidated cases.[1] In Docket No. 361717, the jury convicted defendant of discharging a firearm from a motor vehicle causing serious bodily impairment, MCL 750.234a(1)(c), carrying a concealed weapon (CCW), MCL 750.227, four counts of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a), and five counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In Docket No. 361718, the jury convicted defendant of assaulting, resisting, or obstructing a police officer, MCL 750.81d(1), and another count of CCW. The trial court sentenced defendant to 67 to 120 months' imprisonment for three of the AWIGBH convictions and 76 to 120 months for the remaining one; 120 to 240 months for discharging a firearm from a motor vehicle; 23 to 160 months for one of the CCW convictions and 23 to 60 months for the other; 24 months for each felony-firearm conviction; and time served for the assaulting, resisting, or obstructing conviction.

On appeal, defendant argues that (1) the trial court erred by joining the two lower-court cases for a single trial; (2) the jury venire failed to represent a fair cross section of the community, violating his Sixth Amendment right to an impartial jury; and (3) the prosecution failed to present

---

[1] *People v Williams*, unpublished order of the Court of Appeals, issued June 14, 2022 (Docket Nos. 361717 and 361718).

sufficient evidence to disprove his claim of self-defense as to the convictions in Docket No. 361717.[2] Finding no error, we affirm.

## I. BACKGROUND

Docket No. 361717 arises from a July 5, 2019 altercation between defendant's friend, Ashley Jennings, and her then-boyfriend, Andrew Baum-Bancroft, which culminated in defendant firing at a vehicle in which Baum-Bancroft was a passenger. The driver of that vehicle, Olivia Dantzler, was struck and paralyzed. Docket No. 361718 stems from law enforcement's attempt to arrest defendant six days later on a warrant related to the shooting. During that incident, defendant physically resisted the officers, and police recovered a semiautomatic handgun with an extended magazine from a backpack defendant was carrying. The two cases were originally charged by separate informations but were joined for a single jury trial on the prosecution's motion.

The trial evidence showed that on July 4, 2019, Baum-Bancroft went to a park to watch fireworks with his friend, Michael Phelps, his then-girlfriend, Jennings, and her two children, CW and KW. After Baum-Bancroft and Jennings got into an argument, Baum-Bancroft and Phelps walked to the nearby home of Robert Perez, who was hosting a gathering. Jennings left with her children, picked up defendant and another friend, Jaquanda Johnson, and continued to argue with Baum-Bancroft by phone. The dispute escalated, and after Baum-Bancroft and defendant exchanged words over the phone, they agreed to meet for a fistfight.

Jennings then drove to Perez's house, where defendant exited her truck and displayed two firearms. Jacob Lafler, one of Perez's guests, testified that defendant shouted that they "need[ed] to send [Baum-Bancroft] out of the house or he'll just shoot the whole house up." Lafler "bluffed and said that [he] had a weapon of [his] own" and threatened to use it if defendant did not leave. Defendant then returned to the truck, and Jennings drove away. She proceeded to three locations Baum-Bancroft claimed to be at, including a liquor store, but did not find him.

Meanwhile, Baum-Bancroft called his sister for a ride home. She arrived with Dantzler driving. Baum-Bancroft sat behind Dantzler, his sister took the front passenger seat, and Phelps sat in the rear passenger seat. Baum-Bancroft warned Dantzler that "[Jennings] is on her way and she's bringing somebody with a gun."

As Dantzler attempted to exit the driveway, Jennings drove up and blocked the car. When Dantzler tried to drive around it, defendant pushed Jennings back into her seat and fired five or six shots from a revolver through the open driver's-side window. One bullet struck Dantzler's shoulder, leaving her paralyzed, and the car crashed into a telephone pole. Jennings and her passengers fled before law enforcement arrived.

Police identified defendant as a suspect and obtained a warrant for his arrest. On July 11, 2019, undercover officers observed defendant exiting his apartment to retrieve mail. When the fugitive apprehension team entered the parking lot in marked cars with emergency lights activated,

---

[2] In his brief, defendant also challenged the trial court's award of jail credit, but his counsel withdrew that argument at oral argument.

defendant ran toward his apartment, ignored commands to stop, and resisted officers' attempts to handcuff him. A search of his backpack revealed a semiautomatic handgun and an extended magazine.

During a custodial interview, defendant initially denied involvement in the shooting but later admitted to "light[ing] the car up." He claimed that Baum-Bancroft used racial slurs, threatened Jennings and CW, and previously assaulted Jennings, and that he fired to scare Baum-Bancroft and "get him away from that family." When asked how he knew Baum-Bancroft was in the car, defendant responded, "I don't know, I just got drunk and I just felt it." He later asserted that he fired because he "saw something shiny" inside the vehicle and thought Baum-Bancroft might have a gun.[3] After the shooting, Jennings drove defendant to his sister's house, where he disposed of the revolver.

At trial, defendant argued that he acted in lawful self-defense and in defense of others, emphasizing Baum-Bancroft's threats and racial slurs, his own statement about seeing a metallic object, and CW's testimony that he saw something resembling a gun in Dantzler's car. The jury rejected that defense and convicted defendant as described above. The trial court thereafter sentenced him as indicated, and this appeal follows.

## II. DISCUSSION

### A. JOINDER

Defendant first contends that the trial court abused its discretion by joining the two cases for a single trial because the offenses charged were not "related" within the meaning of MCR 6.120(B)(1).

"The ultimate decision on permissive joinder of related charges lies firmly within the discretion of trial courts." *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014) (cleaned up). "To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). We review a trial court's factual findings for clear error and review de novo questions of law, including whether charged offenses are related and the interpretation of court rules. *Gaines*, 306 Mich App at 304; *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 361978); slip op at 2 (citation omitted).

Joinder of multiple cases involving a single defendant is governed by MCR 6.120, which states in relevant part:

---

[3] Baum-Bancroft denied possessing or brandishing a gun on the night of the shooting. Law enforcement did not recover any firearms from Dantzler's car and found no evidence that Jennings's truck had been struck by gunfire.

**(B) Postcharging Permissive Joinder or Severance.** On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant . . . when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

\* \* \*

**(C) Right of Severance; Unrelated Offenses.** On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1). [MCR 6.120(B)-(C).]

The *Williams* Court explained that charges are not related "simply because they [are] of the same or similar character." *Williams*, 483 Mich at 235 (quotation marks and citation omitted). Joinder is appropriate only when the offenses are "logically related" and "there is a large area of overlapping proof." *Id*. at 237 (quotation marks and citations omitted).

Here, defendant was charged by two separate informations. Before trial, the prosecution moved to join the cases under MCR 6.120, asserting that the firearm and extended magazine recovered during defendant's July 11, 2019 arrest "matched the description of the weapon used in the July 5, 2019 incident." The prosecution acknowledged, however, that police had not recovered any "usable bullets" from the shooting and therefore could not conduct ballistics testing to confirm whether the recovered firearm was the same weapon discharged during the incident. The prosecution argued that this connection—together with defendant's attempt to flee from officers on July 11—established a sufficient "nexus" between the offenses to justify joinder. Defendant opposed the motion, maintaining that the firearm recovered during the arrest was not the same weapon discharged in the shooting and arguing that joinder "would be way more prejudicial than it is probative."

The trial court granted the motion, finding that the offenses were related because the July 11 charges arose directly from law enforcement's attempt to arrest defendant for the July 5 shooting. The court also relied on the temporal proximity between the incidents and the prosecution's representations about the recovered firearm, but allowed defendant to renew his

objection "[i]n the event that there is any difference between the representations today as far as dates, as far as the—if there were bullets recovered . . . ."

Defendant moved for reconsideration, citing his custodial statements and preliminary-examination testimony to show that the recovered handgun differed from the weapon discharged in the shooting. The prosecutor conceded that the record indicated the guns were not the same, but the court nonetheless denied reconsideration, concluding that joinder remained proper "based on the circumstances" and its understanding of the July 11 incident.

We discern no abuse of discretion. The July 11 charges arose directly from law enforcement's attempt to arrest defendant on a warrant issued for the July 5 offenses. And while temporal proximity is not required to establish that offenses are related, *Williams*, 483 Mich at 241, it is a relevant consideration under MCR 6.120(B)(1), *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). The incidents here occurred six days apart.

Moreover, the record supports a reasonable inference that the semiautomatic handgun and extended magazine recovered during the arrest linked the offenses. Although the evidence corroborates defendant's claim that the recovered firearm was not the one discharged in the shooting, the record nonetheless supports an inference that defendant possessed both firearms— the revolver used in the shooting and the semiautomatic handgun later recovered during his arrest—on the night of July 5, 2019. During his custodial interview, defendant confirmed that he displayed "both" of his guns when he first appeared at Perez's house, and security footage from that same night depicted a semiautomatic handgun with an extended magazine protruding from his left hip. Detective testimony further indicated that the firearm seen in that footage matched the weapon seized during the arrest.

There was also significant overlapping proof. Defendant's attempt to flee arrest on July 11 was admissible in connection with the July 5 offenses as "[e]vidence of flight," which "may be used to show consciousness of guilt." *People v McGhee*, 268 Mich App 600, 613; 709 NW2d 595 (2005). The jury could likewise infer consciousness of guilt from defendant's decision to dispose of the firearm used in the shooting—an inference strengthened by the fact that he retained the semiautomatic handgun that was also in his possession on the date of the shooting but was not directly linked to it. When detectives first confronted him, defendant denied any involvement and insisted that the semiautomatic handgun recovered during his arrest had never been fired, an apparent attempt to mislead police about his role in the shooting. See *People v Wade*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369106); slip op at 9 (recognizing that a jury may infer consciousness of guilt from evidence that a defendant "destroyed or hid evidence or sought to conceal their involvement in a crime" and "attempt[ed] to evade responsibility" by "lying or being deceptive").

Additionally, to convict defendant of resisting or obstructing, the prosecution had to prove "that the officers acted lawfully" when attempting to arrest him. *People v Quinn*, 305 Mich App 484, 491-492; 853 NW2d 383 (2014). Accordingly, evidence explaining that the officers were executing an arrest warrant based on the July 5 shooting was directly relevant to the July 11 charges.

-5-

Because the offenses were logically related and involved overlapping proof, the trial court did not abuse its discretion by joining the cases for a single jury trial.

Even if the offenses were not related within the meaning of MCR 6.120(B)(1) and joinder was improper, any error was harmless. "Under MCL 769.26, a preserved, nonconstitutional error[4] is not grounds for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative." *Williams*, 483 Mich at 243. "Similarly, MCR 2.613(A) provides that an error is not grounds for disturbing a judgment 'unless refusal to take this action appears to the court inconsistent with substantial justice.' " *Id*.

Here, defendant offers only the assertion that joinder portrayed him as a "gun toting kind of guy." He identifies no specific evidence admitted as a result of the joinder that would have been inadmissible otherwise. The trial court instructed the jury that each charge was a "separate crime[]," that it "must consider each crime separately in light of all the evidence in the case," and that it "may find the defendant guilty of all or any combination of these crimes or not guilty." Jurors "are presumed to follow their instructions," which "are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted); see also *Williams*, 483 Mich at 244 (holding that similar jury instructions supported the conclusion that the misjoinder was not outcome-determinative). Moreover, there was substantial overlap in the evidence between the two cases, and defendant again identifies no evidence in the joint trial that would have been inadmissible had the cases been tried separately. Under these circumstances, any error in joining the cases was harmless.

## B. JURY VENIRE

Defendant next asserts that he was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.

"Whether [a] defendant was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community is a constitutional question that we review de novo." *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012). We review a trial court's factual findings for clear error. *Id*.

---

[4] Although defendant argues that his "due process right to a fair trial" required separate trials— i.e., that his joinder challenge is constitutional in nature—"improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Williams*, 483 Mich at 244 (cleaned up). While defendant's brief on appeal cites caselaw generally standing for the proposition that misjoinder causes prejudice when it allows otherwise inadmissible evidence to be introduced at trial, he does not identify any otherwise inadmissible evidence introduced as a result of the purported misjoinder. Thus, to the extent that he intended to challenge the joinder on constitutional grounds, he has abandoned that challenge by failing to adequately brief it. See *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue.").

"The Sixth Amendment of the United States Constitution guarantees a defendant the right to be tried by an impartial jury drawn from a fair cross section of the community." *Id*. To establish a prima facie fair-cross-section violation, a defendant must satisfy the three-part test set forth in *Duren v Missouri*, 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979):

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Id*. at 364.]

In this case, after the jury was empaneled and the initial instructions were read, defense counsel objected to the racial composition of the venire, noting that only one prospective juror was African American. The trial court held a brief hearing, during which the circuit court's jury board coordinator testified regarding the selection process. The court found no evidence that the composition of the venire resulted from "any direct conduct or any intentional act" and therefore declined to dismiss the selected jury.

On appeal, defendant contends that he satisfied the first two *Duren* prongs and that the trial court erred in analyzing the third prong by failing to consider whether underrepresentation reflected a generally recurring or inadvertent exclusion. We disagree.

Regarding the first prong, there "is no dispute that African-Americans, the group alleged to be excluded, are a distinct group in the community for the purposes of determining whether there is a violation of the Sixth Amendment's fair-cross-section requirement." *Bryant*, 491 Mich at 598. The issue then is whether defendant made a prima facie showing as to the second and third prongs.

"The second prong requires defendant to show that 'representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community[.]' " *Bryant*, 491 Mich at 598, quoting *Duren*, 439 US at 364 (alteration in original). To analyze that prong, "a court must examine the composition of jury pools and venires *over time* using the most reliable data available to determine whether representation is fair and reasonable." *Bryant*, 491 Mich at 599-600.

Defendant asserts "[t]here does not appear to be any doubt that African Americans were 'unfairly represented in this venire.' " The record does not indicate how many prospective jurors were summoned or appeared for jury service, but approximately 22% of Genesee County's population is African American, and only one prospective juror in defendant's venire was African American. The trial court acknowledged this underrepresentation, noting that it was "not pleased to see the low amount of diversity in our jury," but concluded that it was "not because of any direct conduct or any intentional act."

Evidence of underrepresentation in a single venire, however, is insufficient. As *Bryant* explained, "[t]he representation of African-Americans in defendant's venire is only relevant as part of the larger picture of venires or jury pools. Because underrepresentation in a single venire could result from chance, evaluating whether representation of a distinct group is fair and

-7-

reasonable requires evaluating venire composition over time." *Id*. at 602. Defendant presented no data concerning "the composition of venires over a significant time period rather than just the defendant's individual venire." *Id*. at 600 (emphasis omitted). Defendant has therefore failed to make a prima facie showing as to *Duren*'s second prong.

Defendant also failed to satisfy the third prong, which requires evidence that the underrepresentation "is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 US at 364. "A systematic exclusion is one that is inherent in the particular jury-selection process utilized." *Bryant*, 491 Mich at 615-616 (quotation marks and citation omitted).

Here, the jury board coordinator testified that the State annually provides a "source list" of all Genesee County residents with a driver's license or state identification card. The coordinator then enters the desired number of jurors into a computer system, which randomly generates names from the source list. The system neither identifies prospective jurors by race nor tracks the race of individuals who fail to appear after being summoned. That evidence does not establish that the underrepresentation of African Americans resulted from a systematic exclusion inherent in the selection process.

Because defendant has not satisfied the second and third prongs of the *Duren* test, he is not entitled to relief based on the racial composition of the venire.[5]

C. SUFFICIENCY OF THE EVIDENCE

Defendant next submits that the prosecution failed to present sufficient evidence to disprove his self-defense claim beyond a reasonable doubt with respect to his convictions arising out of the July 5 shooting.

We review de novo challenges to the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020). "But more importantly, '[t]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict.' " *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018), quoting *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (alteration in original). The prosecution is not required to disprove every reasonable theory of a defendant's innocence; it "need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *Kenny*, 332 Mich App at 403. We resolve any conflicts in the evidence in favor of the prosecution. *Id*.

---

[5] To the extent that defendant seeks a remand for an evidentiary hearing to develop a record in support of this challenge, he has not provided the required affidavit or offer of proof as to the facts to be established. See MCR 7.211(C)(1)(a) (requiring an appellant to support a motion to remand "by affidavit or offer of proof regarding the facts to be established at a hearing"). We therefore decline to remand.

A person not engaged in the commission of a crime may use deadly force against another anywhere he or she has a legal right to be if he or she "honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual." MCL 780.972(1)(a). "The reasonableness of a person's belief regarding the necessity of deadly force depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *People v Guajardo*, 300 Mich App 26, 42; 832 NW2d 409 (2013) (quotation marks and citation omitted). But "a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *Id*. at 35.

A defendant asserting self-defense bears the initial burden of "producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist." *People v Dupree*, 486 Mich 693, 712; 788 NW2d 399 (2010). The burden then shifts to the prosecution to disprove self-defense beyond a reasonable doubt. *Id*.

In this case, the evidence established that defendant and Baum-Bancroft argued by phone before the July 5 shooting and ultimately agreed to meet for a fistfight. Jennings and defendant drove to several locations in search of Baum-Bancroft, including multiple trips to Perez's home. On their final visit, Jennings stopped her truck at the end of the driveway, blocking Dantzler's vehicle from exiting. As Dantzler attempted to drive around the truck, defendant fired multiple shots from the open driver's-side window, striking Dantzler.

In support of his self-defense claim, defendant points to evidence that Baum-Bancroft called him racial epithets, threatened to beat Jennings and CW, and had previously assaulted Jennings. He also highlights testimony from CW that he saw "something that resembled a gun" in Dantzler's car and shouted "gun" moments before the shooting, as well as defendant's own statement to police that he saw a shiny or metallic object inside the car before firing.

Defendant's arguments are unavailing. Evidence that Baum-Bancroft had threatened Jennings and CW during a phone argument and had previously assaulted Jennings does not support an honest and reasonable belief that "the use of deadly force [was] necessary to prevent the *imminent* death of or *imminent* great bodily harm to . . . another individual." MCL 780.972(1)(a) (emphasis added). Nor do Baum-Bancroft's use of racial slurs or prior conduct create a reasonable belief that deadly force was necessary to prevent imminent death or great bodily harm to defendant or another person.

Even assuming that CW's testimony and defendant's statement to police were sufficient to establish a prima facie claim of self-defense, the prosecution presented ample evidence to disprove that defense beyond a reasonable doubt. CW testified that he "saw something that resembled a gun" inside Dantzler's car but clarified that he did not "have good eyesight," explaining that "it looked like a gun, not it is a gun."

Similarly, defendant told police that he saw something shiny or metallic inside the car and thought Baum-Bancroft might have a gun. Yet he also admitted that he could not see inside the car well enough to know whether Baum-Bancroft was even in the vehicle, stating that he "just felt" that he was. The evidence further showed that Dantzler's car was attempting to drive away when defendant fired, undermining any claim that deadly force was necessary to prevent imminent harm.

Defendant's shifting explanations to police also weakened his self-defense theory. After initially denying involvement, he admitted that he fired the gun but claimed he did so "to protect [Jennings's] family" and to scare Baum-Bancroft away because of prior abuse. His later statements about seeing a metallic object came only after those earlier justifications. Moreover, by his own account, he could not see clearly into the car to confirm either Baum-Bancroft's presence or that the object he saw was a weapon.

Defendant's conduct after the shooting further supported the jury's rejection of self-defense. It is undisputed that he attempted to flee and resisted arrest, conduct from which the jury could infer consciousness of guilt. See *McGhee*, 268 Mich App at 613. Consciousness of guilt was also evidenced by defendant's disposal of the firearm used in the shooting and his initial lies to police denying involvement. See *Wade*, ___ Mich App at ___; slip op at 9.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that the prosecution disproved defendant's claim of self-defense beyond a reasonable doubt.

Affirmed.

/s/ Matthew S. Ackerman
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin